**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**DONALD G. RICHARDSON,**

          **Plaintiff,**         **CIVIL ACTION NO. 12-cv-10131**

   **vs.**

                              **DISTRICT JUDGE AVERN COHN**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

          **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

     Plaintiff Donald Richardson seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g).  (Docket no. 1.)  Before the Court are Plaintiff's Motion for Summary Judgment or Remand (docket no. 17) and Defendant's Motion for Summary Judgment (docket no. 18).   The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Docket no. 6.)  The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

**I.**     **RECOMMENDATION:**

     This Court recommends that Plaintiff's Motion (docket no. 17) be GRANTED IN PART AND DENIED IN PART and that Defendant's Motion for Summary Judgment (docket no. 18) be DENIED.

**II.**     **PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Social Security Income with protective filing dates of January 16, 2009, alleging that he had been disabled since August 10, 2008, due to various mental and physical impairments.  (TR 129-35.)  The Social Security Administration denied benefits.  (TR 72-83.)  Plaintiff requested a *de novo* hearing, which was held on August 3, 2010, before Administrative Law Judge (ALJ) Peter Dowd, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the regional economy.  (TR 26.)  The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced the instant action for judicial review.  Plaintiff filed his Motion for Summary Judgment or Remand, and Defendant filed his Motion for Summary Judgment.

## III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff was 46 years old at the time of the administrative hearing and 44 years old at the time of alleged onset.  (*See* TR 38-39.)  Plaintiff has past work experience as a delivery driver; a nursery foreman; a furniture delivery driver; a produce associate at Walmart; a prep cook, food server, a cashier, and drive-through worker at Boston Market; and a scale operator at a junkyard. (TR 41, 42, 44, 45.)  Plaintiff testified that he hasn't worked since August 2010 when he quit his job at the junkyard because he could not perform the work that he was asked to perform due to his physical limitations.  (TR 45-46.)  At the time of the hearing, Plaintiff had no source of income.  (TR 46.)  He has a high-school GED, and he spent three years in the U.S. Army.  (TR 39-40.)  Plaintiff testified that he is five-foot, seven-inches tall and weighs 210 pounds.  (TR 47.)  He receives food stamps, and he lives with his wife, who does have her own source of income.  (TR 47-48.)  Plaintiff

2

testified that he has used marijuana since 1981, and at the time of the hearing, he use marijuana approximately five or six times a day. (TR 49-50.) He also testified that he drinks approximately six beers every day. (TR 50.) His wife pays for his marijuana and beer. (TR 50.)

Plaintiff testified that he has the following conditions: (1) degenerative joint disease of the knees; (2) degenerative joint disease of the left elbow; (3) arthritis of the left wrist; (4) carpal tunnel syndrome; (5) a history of substance abuse; (6) dysponia with symptoms of depression; (7) a history of anxiety; (8) a medical condition on his left thumb that required trigger-release surgery; (9) arthritis between his shoulder blades, which causes his vertebrae to pop put of place; (10) severe acid reflux; and (11) problems with forgetfulness and lack of concentration cause by his medications. (TR 48-57.) Plaintiff also testified that he has trouble sleeping because of the pain, which, in turn, causes fatigue. (TR 55-56.)

Plaintiff testified that his pain is "[u]p to 8, a strong 8" on a scale of 1 to 10. (TR 53.) When he takes his medications, it goes "down to about a 5." (TR 53.) The pain generally effects his left elbow, his right knee, and his right wrist, but his left knee also gives him problems. (TR 53.) He generally sleeps about three to five hours a night, and then he takes two one-to-three-hour naps each day. (TR 55-56.) Plaintiff testified that he has trouble understanding things that he reads, even with multiple readings, and that he will "think about . . . doing [something], and then [he will] get up to do it and [he] can't remember." (TR 56.) He testified that he can only sit for approximately 30 minutes before he has to get up, and he can only stand for approximately five minutes before he has to sit down. (TR 57.) He also testified that he can only walk for about five minutes, that he can only lift about two pounds, and that he has problems gripping and holding on to things because he doesn't have any hand strength. (TR 57-58.) Plaintiff testified that his fingers "haven't working in a long time" and that while he can bend at the waist, he cannot crouch or kneel. (TR 58-59.)

3

Plaintiff testified that he had arthroscopic surgery on his right knee in 1985 and again in 2007.  (TR 48.)  At the hearing, he was wearing a sleeve on his left elbow; he also had surgery on his left elbow in 2010.  (TR 49, 51.)  Plaintiff had surgery for carpal tunnel on both of his wrists in 2005.  (TR 49.)  He had surgery on his left thumb in 2010.  (TR 51.)  He was seeing a physical therapist for patellar tendinosis of the right knee.  (TR 51.)  Plaintiff testified that he saw his doctor "probably every two weeks" at the VA Hospital in Ann Arbor, Michigan.  (TR 52.)  He also sees a counselor at the VA Hospital in Flint, Michigan, for his depression.  (TR 52-53.)  Plaintiff takes ibuprofen, Tramadol, Zantac, and Vicodin for his pain and his stomach ailments.  (TR 53-54.)  He also takes Sertraline for his depression.  (TR 54.)  Plaintiff also testified that he ices his left elbow, tries to elevate his right knee three to four times a day, and uses a prescribed TENS unit for his knee. (TR 54.)

## B.    Medical Record[1]

After review of the medication evidence in the record, the parties briefs, and the ALJ's decision, Defendant's account[2] of Plaintiff's medical history appears to be an accurate reflection of the record with respect to the issues raised in Plaintiff's Motion.  (*See* docket nos. 17 at 6-13; 18 at 6-12).  Thus, the Court will adopt Defendant's recitation of the medical record and will address any

---

[1]The Parties indicate that Plaintiff submitted a portion of the medical record to the ALJ and then supplemented that record when he submitted his appeal to the Appeals Council. (Docket no. 17 at 9; docket no. 18 at 13.)  As Defendant indicates, Plaintiff has not requested a remand under Sentence Six of 42 U.S.C. § 405(g); thus, the Court cannot consider any evidence not before the ALJ.  *See Cline v. Comm'r*, 96 F.3d 146, 148 (6th Cir. 1996).  Therefore, the recitation of the medical evidence is limited to the information presented to the ALJ, which excludes pages 585 through 965 of the Transcript.  (*See* TR 5.)

[2]Defendant's account of Plaintiff's medical record is more accurate than Plaintiff's account because Plaintiff includes evidence submitted on appeal that was not before the ALJ. (*See, e.g.*, docket no. 17 at 12-13.)

4

additionally relevant evidence throughout this Report and Recommendation:

In July 2008, Plaintiff presented to Dr. John Stoker with a variety of complaints, including fatigue, degenerative right knee arthritis, and heart palpitations (Tr. 198). Plaintiff had bilateral positive Tinel's sign (test for nerve damage) and Fallon's sign (possibly a misspelling of Phalen's sign, a test for carpal tunnel syndrome), right knee crepitance and no difficulties walking and standing (Tr. 200). Dr. Stoker prescribed an anti-inflammatory drug (Tr. 201). A right knee x-ray that month showed degenerative arthritis and calcifications in a ligament (Tr. 268).

A September 2008 x-ray of Plaintiff's left elbow showed calcific bursitis, degenerative arthritis, and spur formation at the olecranon process (Tr. 311). Plaintiff underwent a left upper extremity EMG study later that month due to complaints of wrist and thumb pain and a history of carpal tunnel syndrome requiring surgery (Tr. 314). The test results were compatible with a diagnosis of mild carpal tunnel syndrome, but the administering doctor stated that Plaintiff's history and an examination indicated deQuervain's tenosynovitis (Tr. 314). An EMG study of Plaintiff's right upper extremity the next month indicated mild to moderate carpal tunnel syndrome (Tr. 321).

A December 2008 x-ray of Plaintiff's left knee showed mild degenerative arthritis (Tr. 322). Plaintiff returned to Dr. Stoker later that month, with complaints including right knee pain, depression, and degenerative joint disease (DJD) (Tr. 203). Plaintiff had a decreased range of right knee motion, but no difficulty walking or standing (Tr. 204-05). Dr. Stoker instructed Plaintiff to use ice and added an anti-depressant to his medications (Tr. 206). A right knee x-ray that day showed mild arthritic narrowing of the medial compartment and two soft tissue calcifications (Tr. 325).

In February 2009, Plaintiff presented to Dr. Frederick Schreiber, an orthopedic surgeon, with complaints of bilateral knee and left elbow pain (Tr. 582). Plaintiff stated that he had constant knee pain, worse on the right, and left elbow pain (Tr. 582). Plaintiff walked in the examination room with a "really minimal limp," was using a cane, and had a significant limp when walking down a hall (Tr. 583). In his knees, Plaintiff had mild synovial crepitus, diffuse joint line tenderness, and left patellar tendon pain (Tr. 583). Plaintiff displayed left elbow apprehension and guarding (Tr. 583). Dr. Schreiber noted that an elbow x-ray showed profound degenerative arthritis with multiple loose joint bodies and marginal spurring; a right knee x-ray revealed degenerative disease; and a left knee x-ray was normal (Tr. 584). Dr. Schreiber diagnosed post-traumatic left elbow arthritis with a loss of motion, early right knee degenerative arthritis, and quadriceps tendinitis of the left knee (Tr. 584). He stated that both knees should respond to physical therapy and recommended antiinflammatory drugs (Tr. 584). Dr. Schreiber stated that Plaintiff's elbow would not improve with exercise and recommended maintaining motion and using the arm as tolerated (Tr. 584).

5

Plaintiff presented to Dr. Stoker in March 2009, with complaints of shortness of breath (Tr. 578). He had wheezing, rales, and rhonchi; left elbow crepitus and a decreased range of motion; and no lower extremity abnormalities (Tr. 579-80). Dr. Stoker made a number of recommendations, including that Plaintiff lose weight; Plaintiff was noted to be a "noncompliant patient" (Tr. 581). Plaintiff returned to Dr. Stoker the next month (Tr. 573). He had a decreased ranges of right knee and left elbow motion with crepitus, but he had no neurological deficits, and no difficulty walking or standing (Tr. 574-76). Dr. Stoker continued Plaintiff's medications, advised him to lose weight, and noted that he was a "noncompliant patient" (Tr. 577). Later that month, Dr. Stoker noted that he had decreased ranges of motion in both knees and left elbow with crepitus and a reduced range of lumbar spine motion with muscle spasms (Tr. 571). There were no neurological deficits (Tr. 571).

In April 2009, Carrie Neubecker, Psy.D. examined Plaintiff for the state DDS (Tr. 329-32). Plaintiff stated that he felt sad and hopeless every day and had anxiety attacks (Tr. 329). He reported abusing alcohol and marijuana in the past (Tr. 330). Plaintiff reported feeling withdrawn and his emotional state was generally normal, with some underlying hostility (Tr. 331). Dr. Neubecker opined that Plaintiff was moderately impaired in his abilities to understand, remember, and carry out instructions; respond appropriately to co-workers; and adapt to change and stress in the workplace (Tr. 332). She diagnosed dysthymic and anxiety disorders, alcohol dependence in sustained partial remission, and a history of cannabis abuse (Tr. 332).

Later that month, Rom Kriauciunas, Ph.D., reviewed the medical evidence for the state DDS and created a report (Tr. 342-59). Dr. Kriauciunas opined that Plaintiff had a mild limitation in activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence, or pace (Tr. 352). Dr. Kriauciunas found that Plaintiff was "able to concentrate, follow instructions for unskilled work for full 8 hr. workday" (Tr. 354). Dr. Kriauciunas opined that he was able to perform simple, low-stress, unskilled work on a sustained basis (Tr. 358). Dr. Kriauciunas stated that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; maintain socially appropriate behavior and/or adhere to basic standards of neatness and cleanliness; and respond appropriately to work changes (Tr. 358).

Plaintiff returned to Dr. Stoker eleven times between May and October 2009, with complaints including bilateral knee and left elbow pain and Dr. Stoker managed his medications (Tr. 519-69). Dr. Stoker often found left elbow and right knee abnormalities, such as decreased ranges of motion, muscle spasms, and crepitus, but no neurological deficits or muscle strength and tone abnormalities (Tr. 519-69). Dr. Stoker stated on nine occasions that Plaintiff had no difficulty walking or standing (Tr. 521, 529, 533, 542, 547, 552, 557, 561, 567). Plaintiff was frequently noted to be non-compliant (Tr. 530, 534, 539, 543, 548, 553, 558, 563, 568). Plaintiff began physical therapy in April 2009, for left elbow degenerative joint disease, but was

6

discharged because he failed to attend four out of seven sessions (Tr. 491).

Between August and October 2009, Plaintiff presented to doctors at Family Orthopedic Associates on four occasions for treatment of his left elbow and right knee conditions (Tr. 364-71). During the first visit, a doctor diagnosed left elbow and right knee osteochondromatosis (benign tumors) following a review of x-rays and an examination (Tr. 370-71). At the next visit, a doctor evaluated Plaintiff's left elbow, diagnosed significant osteoarthritis, and recommended non-surgical treatments, including pain management (Tr. 369). At the third visit, a doctor found right knee tenderness and a small effusion and recommended an injection (Tr. 367). At the final visit, a doctor noted that a steroid injection to the left elbow worsened Plaintiff's pain, declined to recommend surgery, and made medication suggestions (Tr. 366).

In November 2009, Plaintiff presented to a doctor at the U.S. Department of Veteran's Affairs (VA), for a second opinion on possible surgery for his left elbow (Tr. 451). Plaintiff had left elbow tenderness and limited motion due to pain and restricted motion in his right knee (Tr. 452). An x-ray performed several days later showed significant degenerative changes with multiple large loose bodies in the left elbow joint (Tr. 453). Plaintiff underwent a left elbow CT scan later that month, which showed an acute fracture in the coracoid process, a tiny lucency in the capitellum, advanced osteoarthritis, at least four loose bodies, and small joint effusion (Tr. 454).

That month, a VA social worker performed a psychiatric evaluation (Tr. 443-51). Plaintiff reported difficulty with focus and concentration and he had a dysthymic mood and flat affect (Tr. 449). The social worker diagnosed depression, anxiety, and alcohol abuse, and apparently recommended counseling (Tr. 450). Several days later, Plaintiff presented to a physician's assistant for a medication review and reported taking anti-depressants (Tr. 437). Plaintiff stated that his memory and concentration were terrible (Tr. 437). Plaintiff attended therapy sessions with a social worker between December 2009, and February 2010 (Tr. 427-428, 430-31, 435-36).

In December 2009, Dr. Stoker completed a report for the Michigan Department of Human Services and opined that Plaintiff could lift and carry ten pounds occasionally; stand and/or walk for less than two hours per workday; and sit for about six hours per workday (Tr. 327). Dr. Stoker stated that Plaintiff should not use his hands and arms for grasping and pushing or pulling, and refrain from using foot or leg controls (Tr. 327).

In February 2010, Plaintiff presented to Dr. Stoker for medication refills (Tr. 477). Plaintiff had no difficulty standing and walking and displayed decreased ranges of right knee and left elbow motion with crepitus, but no neurological deficits (Tr. 478-80). Later that month, Plaintiff underwent left elbow surgery, which involved an arthrotomy (incision into a joint), loose body removal, and debridement (Tr. 456).

Left elbow x-rays performed several days later revealed abnormalities including significant degenerative osteoarthritis and a remaining large osseous body in the joint (Tr. 385). A left elbow x-ray in March 2010, yielded similar results to the February 2010 x-rays (Tr. 384-85). A right knee x-ray that month showed moderate osteoarthritis and results consistent with small intra-articular bodies (Tr. 383). An April 2010 left elbow x-ray showed a type of joint space loss consistent with degenerative changes and evidence suggesting a remote fracture (Tr. 382).

In May 2010, Plaintiff presented to a physician's assistant with the VA to re-check his left elbow and to evaluate his right knee pain (Tr. 399-401). Plaintiff reported that his left elbow pain had improved and that the neuropathic pain he had before surgery had resolved (Tr. 400). Plaintiff had tenderness in his right knee along the patellar tendon, inferior patella, and along two joint lines (Tr. 400). He displayed marked quadriceps atrophy and decreased tone (Tr. 400). The physician's assistant noted that Plaintiff had stable post-operative left elbow changes and moderate to severe degenerative joint disease in his right knee with right knee patellar tendonitis (Tr. 400). Plaintiff was instructed to use a right knee sleeve, undergo right knee physical therapy, and continue his pain medications (Tr. 401). A left elbow x-ray that day showed that an overlying cyst had been removed and revealed evidence of prior trauma, osteoarthritis, and a large soft-tissue ossification (Tr. 381).

Plaintiff presented to Dr. Stoker later that month for medication refills (Tr. 468). Plaintiff had no difficulty walking or standing, and a decreased range of left elbow motion with crepitus, but no neurological deficits (Tr. 470). Plaintiff's medications were continued (Tr. 471).

(Docket no. 18 at 6-12.)

## C.     The Vocational Expert

The ALJ asked the VE to consider an individual who (1) was of the same age, education, and past work experience as Plaintiff; (2) was limited to lifting a maximum of 10 pounds and could repetitively lift less than 10 pounds; (3) could intermittently stand and walk for a total of two of eight hours in an eight-hour day and could sit for the other six hours; (4) could occasionally climb stairs, balance, and stoop but could not kneel, crouch, or crawl; (5) would need to avoid concentrated exposure of the hands to machinery vibrations; (6) would need to avoid all exposure to hazards, such as unprotected heights and moving industrial machinery; (7) could only perform simple, routine, and repetitive work activities in a stable work environment; and (8) could tolerate superficial contacts

8

with supervisors and coworkers but could not or should not work with the general public.  (TR 64-65.)  The VE testified that the individual could not perform Plaintiff's past work, but he could perform work of a sedentary, unskilled nature, such as an office clerk, an inspector, or a packer.  (TR 65.)  The VE indicated that there were 2,200 jobs, 1,00 jobs, and 1,100 jobs in the lower peninsula of Michigan for each of these jobs, respectively.  (TR 65.)

The ALJ then asked the VE to assume that the same individual could frequently but not constantly handle, finger, or feel.  (TR 65.)  Th VE testified that such an individual could still perform these jobs, but they would be reduced to 1,200 jobs, 750 jobs, and 500 jobs respectively.  (TR 65-66.)  When Plaintiff's attorney asked the VE to add a sit/stand limitation to the individual's RFC, the VE testified that the available jobs would be reduced to 1,000 jobs, 600 jobs, and 400 jobs respectively.  (TR 66.)  When Plaintiff's attorney asked the VE to limit the individual to only occasional handling and fingering, the VE testified that such an individual would be precluded from employment at these positions.  (TR 66.)  Likewise, when asked of the effect on employment if an individual required up to six hours of naps during a workday or if the individual would be off-task twenty percent of the day, the VE testified that the individual would not be able to perform any of the noted jobs.  (TR 66.)

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through June 30, 2010; had not engaged in substantial gainful activity since August 10, 2008; and suffered from severe degenerative joint disease of the right knee, degenerative joint disease of the left elbow, bilateral carpal tunnel syndrome, obesity with recurrent cardiac arrhythmia, and depression and anxiety with substance abuse; he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments.  (TR 18-23.)  The ALJ found that Plaintiff's allegations

9

regarding the extent of his symptoms were not totally credible (TR 25) and, thus, found that Plaintiff could perform a significant number of jobs in the regional economy. (TR 26-27.) Therefore, he was not suffering from a disability under the Social Security Act at any time from August 10, 2008, through the date of the ALJ's decision. (TR 27.)

## V.    LAW AND ANALYSIS

### A.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial

10

evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.   Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis.  In the first four steps, Plaintiff was required to show that:

(1)   Plaintiff was not presently engaged in substantial gainful employment; and

(2)   Plaintiff suffered from a severe impairment; and

(3)   the impairment met or was medically equal to a "listed impairment;" or

(4)   Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work.  If not, Plaintiff would be deemed disabled.  *See id.* at § 404.1520(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

### C.   Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in

11

conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174). Plaintiff argues that Defendant's decision should reversed or remanded under sentence four for the following reasons: (1) the ALJ failed to properly evaluate Plaintiff's credibility; (2) the ALJ did not afford proper weight to the medical opinions of record; (3) the ALJ's determination of Plaintiff's physical RFC is improper; (4) the ALJ's mental RFC for Plaintiff did not properly account for limitations in concentration, persistence, pace, or stress; and (5) the ALJ's step-five determination was improper because the VE did not provide DOT numbers or disclose whether her testimony was consistent with the SCO.[3] (*See* docket no. 17.)

### 1.    Plaintiff's Credibility

---

[3]Plaintiff also alleges that the ALJ's hypothetical to the VE was improper because it did not account for Plaintiff's limitations. (Docket no. 17 at 19.) This argument, however, relies on the assumption that the ALJ's RFC determination was improper. Thus, if the Court finds that the ALJ's determination of Plaintiff's RFC was improper, the hypothetical questions based on that RFC could not have accounted for Plaintiff's limitations. Likewise, if the Court finds that the ALJ's RFC determination was proper, then the ALJ's hypothetical questions based on that RFC are similarly proper. Therefore, the Court will not address this argument.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

13

Plaintiff argues that "the ALJ's credibility determination is based on flawed reasoning and lacks substantial evidence and compliance with Social Security's own rulings and regulations." (Docket no. 17 at 16-17.)  Plaintiff contends that the ALJ "misunderstands Plaintiff's conditions" and that Plaintiff's ability to "drive, dress and groom himself, watch television, cook, play videogames, and play with his dogs" does not undermine his credibility.  (*Id.*)  In support of this contention, Plaintiff notes that "some fairly minimal daily activities are not comparable to typical work activities."  (*Id.* (citing *Rogers v. Comm'r*, 486 F.3d 234, 248-49 (6th Cir. 2007).)  Plaintiff also asserts that the ALJ (1) failed to properly account for Plaintiff's subjective complaints of pain and other limitations, (2) ignored his duty to consider that pain medications can cause forgetfulness or mental difficulty, and (3) failed to properly consider that obesity can exacerbate knee problems. (*Id.* at 18.)  Defendant argues that the ALJ properly found that (1) Plaintiff's alleged symptoms conflicted with the medical evidence of record and with Plaintiff's reported activities, (2) Plaintiff was noncompliant with treatment, and (3) Plaintiff's reported daily activities conflicted with his alleged limitations.  (Docket no. 18 at 19-20.)

After summarizing Plaintiff's testimony at the hearing, the ALJ commenced an extensive discussion of his findings.  The ALJ first noted that "[t]he record appears to offer relatively little support for the claimant's allegations."  (TR 24.)  The ALJ stated that while the record does confirm some of Plaintiff's diagnoses, "the notes of [Plaintiff's] treating doctor, Dr. Stoker, reveal the presence of very few clinical abnormalities."  (TR 24.)  During the relevant period, "there are no indications of significant problems with grip or dexterity, and Dr. Stoker generally explicitly indicate that [Plaintiff] has 'no difficulty standing or walking.'" (TR 24.)  Next, the ALJ noted that Plaintiff's daily activities "also appear inconsistent with his allegations.'  (TR 24.)  The ALJ found that his ability to "drive, dress and groom himself, watch television, cook, play videogames, and

14

play with his dogs," as well as his ability to "employ a cane using his right hand with no apparent difficulty," are irreconcilable with his claim that he has no significant grip strength or that he cannot lift more than 2.5 pounds.  (TR 24.)  The ALJ also noted earlier in his discussion that Plaintiff's ability to drive, handle personal grooming, and play online videogames was inconsistent with his claim that he was "unable to hold or manipulate objects such as a computer mouse." (TR 20.)  The ALJ also found that "[t]here is no indication in the record of the medical need for elevating [Plaintiff's] legs . . . and no indication of significant recurrent effusion or inflammation of any joints." (TR 24.)

Next, the ALJ discussed Plaintiff's treatment compliance.  (TR 24.)  The ALJ found that "claimant is regarded by his doctor as 'noncompliant' with treatment and that his "mental symptoms of reduced attention and memory problems, if they are as pronounced as alleged by [Plaintiff], may well be the result of extensive and chronic abuse of alcohol and cannabis; so to may be [Plaintiff's] alleged need to nap for several hours in the morning and afternoon." (TR 24-25.)  The ALJ noted that Plaintiff's alleged mental symptoms "have not apparently prevented him being (sic) able to drive, watch television, obtain alcohol and cannabis, play videogames, handle his finacnes, attend appointments, and perform other simple activities."  (TR 25.)  Thus, the ALJ found Plaintiff's statements not wholly credible.  (TR 25.)

Nevertheless, the ALJ extended Plaintiff "considerable benefit of the doubt in [his] RFC." (TR 25.)  The ALJ accounted for "significant postural limitations . . . restrictions regarding manipulation and dexterity . . . restrict[ions] regarding exposure to machinery vibrations or hazards . . . and restrict[ions] with regard to mental work and activities." (TR 25.)

Plaintiff asserts that his "ability to play video games on-line . . . [in] no way detracts from manipulative limitations in a competitive work place, as they are not comparable" and that he

15

doesn't "manipulate" his cane, he rests on it.  (Docket no. 19 at 3.)  Additionally, Plaintiff argues

that Plaintiff did not fail to seek treatment, and that his "non-compliance" simply refers to his

inability to eliminate tobacco use and control his weight.  (*Id.* at 3-4.)  Nevertheless, a close reading

of the ALJ's opinion indicates that he used Plaintiff's daily activities as a way to evaluate Plaintiff's

credibility, as is required under 20 C.F.R. § 416.929(c).  And a review of the record (and the ALJ's

decision) shows that Plaintiff was not only non-complaint with regard to drug and alcohol abuse;

he was also discharged from physical therapy for attending only three of seven scheduled sessions.

(*See* TR 19.)

Regardless of Plaintiff's characterization, the ALJ refers to objective evidence in finding

against Plaintiff's credibility.  Thus, even if the Court disagrees with the ALJ, the substantial

deference afforded to the ALJ in matters of credibility weighs against Plaintiff in this matter; the

ALJ's determination is supported by the evidence in the record and is sufficiently specific to make

clear to Plaintiff and the Court the weight given to Plaintiff's statements and the ALJ's reasons for

that weight.[4]  The ALJ could reasonably conclude that Plaintiff's subjective complaints regarding

the severity of his symptoms and the impact of those symptoms were not entirely credible.  The

ALJ's determinations regarding Plaintiff's credibility are supported by substantial evidence, and

therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.

### 2.      Weight of the Medical Opinions

The ALJ must give a treating physician's opinion complete deference if it is supported by

clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial

---

[4]The ALJ's discussion is noteworthy in this regard when compared to many recent
decisions submitted to Defendant.  ALJ Dowd's discussion is particularly extensive and well
articulated in this regard.  (*See* TR 24-25.)

evidence in the record.  20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight."  *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).  The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant.  20 C.F.R. § 404.1527(c)(1).  The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist.  20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)).  If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.  *Wilson*, 378 F.3d at 544 (citation omitted).  Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case

17

record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected.   Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Plaintiff asserts that "the ALJ also plays doctor and improperly weighed the medical opinions of record, dismissing Dr. Stoker's treating opinion" and that he "failed to provide good reasons for rejecting his opinions." (Docket no. 17 at 18-19.) Plaintiff contends that the ALJ's decision was improper because "Dr. Stoker's opinion was consistent with his treatment notes, the opinions of other examining physicians, and the objective evidence." (*Id.* at 19-20.) Defendant argues that the ALJ's decision was proper because he found that Dr. Stoker's opinion conflicted with his own treatment notes and his clinical observations. (Docket no. 18 at 16-17.)

With regard to the medical opinions of record, the ALJ stated as follows:

> The undersigned nots the presence in the record a State of Michigan Medical Needs form complete by Dr. Stoker on January 20, 2009. This form essentially indicates that, as a result of his physical impairments, the claimant would be unable to perform even sedentary exertional work on a full-time basis. The report appears to clash starkly with Dr. Stoker's clinical notes since at least November 2008, however,: again, Dr. Stoker indicates consistently that the claimant has "no difficulty standing or walking" and that the claimant is "noncompliant" with treatment. Dr. Stoker's opinion as stated in the January 2009 medical source statement is inconsistent with the clinical record in general (including his own clinical record) and has been given very little weight here.

> When the claimant's case was adjudicated at the Michigan DDS, the effects of the claimant's physical impairments were not reviewed by a Michigan DDS Medical Consultant. There is otherwise no medical opinion evidence which indicates that the above RFC is not an accurate portrayal of the claimant's capacity for work-related activities.

(TR 25.)

Plaintiff notes that in additional to stating that Plaintiff had "no difficulty standing or walking," Dr. Stoker's notes also indicated that Plaintiff had consistent pain, crepitus, and decreased range of motion in his right knee. (Docket no. 17 at 19.) Moreover, Plaintiff argues, a February

18

2009 assessment by Dr. Schreiber indicates that Plaintiff had "constant intractable pain in both knees right worse than left" and that Plaintiff had a "significant limp favoring his right leg and supporting the right knee with the cane." (*Id.* (citations omitted).) Plaintiff asserts that when Dr. Stoker noted that Plaintiff had "no difficulty standing or walking," he was "observing that Plaintiff was able to stand up and walk into the office," not that Plaintiff could stand or walk for a sustained length of time. (Docket no. 19 at 2.)

The Sixth Circuit has upheld the decision of an ALJ to give less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) if the ALJ provides "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir.2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).

The Court finds that the ALJ failed to provide good reason for his decision to afford "very little weight" to Dr. Stoker's opinion. Moreover, it appears that the ALJ did not consider any opinion at all and, instead, relied on his own reading of Dr. Stoker's notes, as the ALJ indicates that there are no other opinions in the record, let alone any conflicting opinions. Therefore, the Court

19

recommends remanding this matter for a full discussion of the ALJ's reasoning for assigning "very little weight" to Dr. Stoker's opinion.  While such an order may ultimately be an exercise in formality, such a discussion is necessary for the Court to engage in meaningful appellate review.

### 3.    Plaintiff's Physical RFC

Plaintiff argues that the ALJ's physical RFC for Plaintiff is incomplete because it fails to account for Dr. Stokers opinion, which is supported by "a myriad of x-rays, electrodiagnostic studies, and CTS surgery." (Docket no. 17 at 20.)  Plaintiff asserts that the RFC is no more than that ALJ's lay opinion and that "it is unclear how the ALJ formulated his RFC[ b]ecause there is no accurate and logical bridge between the evidence and the decision."  (*Id.* at 20-21 (citing *Hall v. Comm'r*, 2009 U.S. Dist. LEXIS 82445 (E.D.Mich. 2009)).)  Defendant notes that "'the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [his] residual functional capacity,'" which is precisely what the ALJ did here.  (Docket no. 18 at15 (quoting *Webb v. Comm'r*, 368 F.3d, 633 (6th Cir. 2004)).)

As the Court indicates herein, the ALJ erred when he failed to articulate his basis for affording Dr. Stoker's opinion "very little weight."  And when he did so, he failed to articulate the opinions on which he did rely.  Thus, with regard to Plaintiff's physical limitations, it appears that the ALJ did not rely on a medical opinion in determining the RFC; instead, it appears that he developed the RFC based on his own interpretation of the medical record.  Moreover, while the ALJ gave Plaintiff "considerable benefit of the doubt" in developing the RFC, the ALJ did not explain how he reached his decision.  As Plaintiff indicates, the ALJ's decision does not clearly account for the medical evidence in the record.  For that reason, the Court recommends remanding this matter for a discussion of how the ALJ determined Plaintiff's RFC after articulating his reasoning for the weight afforded to Dr. Stoker's opinion.

20

### 4.      Plaintiff's Mental RFC

Plaintiff argues that despite finding that Plaintiff has moderate limitations with concentration, persistence, or pace, the ALJ did not place any such limitations in the hypothetical questions presented to the VE.  (Docket no. 17 at 21.)  Additionally, Plaintiff argues that the ALJ failed to account for any Plaintiff's "difficulty with normal work stress." (*Id.* at 22.)  Instead, the ALJ limited the RFC to work involving "simple, routine, and repetitive work in a stable work environment" and to "superficial exposure to supervisors and coworkers, but [no] work with the general public."  (TR 23.)  Defendant contends that the ALJ's hypothetical included sufficient limitations in concentration, persistence, and pace.  (Docket no. 15 at 18.)

Moderate limitations in concentration, persistence, and pace must be conveyed to the VE through the ALJ's hypothetical, or the VE's responses are insufficient to provide support for the ALJ's decision. *Edwards v. Comm'r*, 383 F.Supp.2d 920, 930-31 (E.D. Mich 2005).  A hypothetical that includes "simple, routine, unskilled work" is not, by itself, sufficient to frame a moderate limitation in concentration, persistence, and pace.  *See id.*  Such a limitation impacts a claimant's ability to meet quotas, stay alert, or work at a consistence pace even when performing simple, routine, unskilled jobs.  *Id.* at 930.  But there is no requirement that the ALJ specifically state that the claimant is "limited in concentration, persistence, or pace." *See Lewicki v. Comm'r*, No. 09-11844, 2010 WL 3905375, *3 (E.D. Mich. Sept. 30, 2010).  The ALJ must create a hypothetical based on the facts of each individual case.  *See id.*

Here, the ALJ limited Plaintiff to "simple, routine, and repetitive work in a stable work environment."  On its surface, the ALJ's hypothetical appears to be insufficient, but a close reading fo the ALJ's opinion indicates that the ALJ found Plaintiff's limitations in concentration, persistence, or pace to be "*no more than* moderate."  (TR 22 (emphasis added).)  Indeed, the ALJ

21

found that "the record does not indicate that the claimant is as limited in memory or attention as he alleged at hearing." (TR 22.) Further, the ALJ found, "He exhibited no serious problems with attention, concentration, cognition or memory during his independent examination of April 2009, and his relatively extensive clinical treatment notes give no indication of the presence of observable deficits in attention, cognition or memory." (TR 22.) Thus, the ALJ gave Plaintiff "considerable benefit of the doubt" when he limited Plaintiff to "simple, routine and repetitive work activities performed in a stable environment . . . consistent with the DDS Mental RFC assessment of record . . . [and] with the evidence." (TR 25.) Thus, the Court finds that with respect to concentration, persistence, and pace, the ALJ's hypothetical appropriately accounted for Plaintiff's limitations.

Plaintiff also asserts that the ALJ erred when he failed to include a limitation for Plaintiff's lack of ability to deal with normal work stress. (Docket no. 17 at 22.) Plaintiff draws the Court's attention to Dr. Neubecker's opinion that Plaintiff is moderately impaired in his ability to "adapt to change and stress in the workplace." (TR 332.) Defendant argues that "[a]lthough not identical to Dr. Neubecker's findings, the ALJ's description did capture Dr. Neubecker's concerns" because "Dr. Neubecker was essentially indicating that Plaintiff had diminished, but not absent, abilities in handling instructions, change, and stress." (Docket no. 18 at 21.) Plaintiff is correct that the ALJ accounted for Dr. Neubecker's limitations when discussing Plaintiff's mental impairments with regard to the listed impairments under 20 C.F.R. Part 404 at Step 3 of his analysis. (*See* TR 22.) Plaintiff, however, does not indicate what portion of the RFC accounts for Plaintiff's "diminished . . . abilit[y] in handling . . . stress." While a very broad reading of "simple, routine, and repetitive work activities in a stable work environment" and "superficial exposure to supervisors and coworkers" *may* account for stress-based limitations, the Court will not entertain such a broad reading. Therefore, the Court recommends remanding this matter to include in Plaintiff's RFC a

limitation for Plaintiff's moderate, stress-based limitations as determined by the ALJ in Step 3.

### 5.     The ALJ's Step-Five Determination[5]

Plaintiff argues that the ALJ's failure to ask the VE for DOT (Dictionary of Occupational Titles) codes is reversible error because "there are both real and potential conflicts with all of the jobs identified by the VE." (Docket no. 17 at 23-24.) Additionally, Plaintiff argues that the ALJ erred when he did not ask if the VE's testimony was consistent with the Selected Characteristics of Occupations defined in the DOT. (*Id.* at 23.)

SSR 00-4p provides that the adjudicator must resolve a conflict between the DOT and the VE "before relying on the VE . . . evidence." The ALJ twice asked the VE whether her testimony was consistent with the DOT. (TR 61, 66). The VE testified that the testimony was consistent. (TR 61, 66.) Plaintiff and his representative had a full opportunity to cross-examine the VE on this issue and with respect to DOT codes and did cross-examine the VE on other issues. (*See* TR 65-66.) Nevertheless, Plaintiff cites to DOT Numbers 910.367-014, 239.362-010, and 529.666-014 to indicate that "packer" positions suggested by the VE are characterized as light, medium, or heavy jobs, which conflicts with the ALJ's sedentary RFC, and that "inspector" positions suggested by the VE require "constant handling and reaching," which conflicts with the ALJ's limitation to "frequent" handing. (Docket no. 17 at 24.) Thus, without the DOT codes relied upon by the VE (and ultimately the ALJ), the Court cannot verify whether the there is any inconsistency between the VE's testimony and the DOT. Accordingly, the ALJ's decision should be vacated and this case remanded to determine whether the VE's testimony is consistent with the DOT.

---

[5]While the recommendations herein would require the ALJ to perform a redetermination at Step 5, the Court will, nevertheless, address Plaintiff's remaining argument in the event that those recommendations are not adopted.

## VI.      CONCLUSION

For the reasons stated herein, Plaintiff's Motion (docket no. 17) should be GRANTED IN PART AND DENIED IN PART, and this matter should be remanded (1) for a full discussion of the ALJ's reasoning for assigning "very little weight" to Dr. Stoker's opinion; (2) for a discussion of how the ALJ determined Plaintiff's RFC after articulating his reasoning for the weight afforded to Dr. Stoker's opinion; (3) to include in Plaintiff's RFC a limitation for Plaintiff's moderate, stress-based limitations as determined by the ALJ in Step 3; and (4) to determine whether the VE's testimony is consistent with the DOT.  Accordingly, Defendant's Motion for Summary Judgment (docket no. 18) should be DENIED.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.


Dated: February 27, 2013          s/ Mona K. Majzoub
                                  MONA K. MAJZOUB
                                  UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

     I hereby certify that a copy of this Report and Recommendation was served upon Counsel
of Record on this date.

Dated: February 27, 2013          s/ Lisa C. Bartlett
                                  Case Manager